**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| DWAYNE GLOWNER,<br><br>    Plaintiff,<br><br>v.<br><br>MULLER-MARTINI MAILROOM SYSTEMS, INC.,<br><br>    Defendant. | Case No. 8:09-cv-01768-TGW |

**DEFENDANT MULLER MARTINI MAILROOM SYSTEMS, INC.'S
MOTION FOR CLAIM CONSTRUCTION**

**I.     INTRODUCTION**

Claims of patent infringement require a two-step analysis:  first, the court construes the claims; and, second, the factfinder applies the construed claims to the accused product. Defendant Muller Martini Mailroom Systems, Inc. ("Muller") therefore requests that the Court construe two terms of U.S. Patent No. 6,755,412 B1 ("'412 patent") prior to trial so that the jury may apply the properly construed claim terms in its infringement and invalidity determinations.

The '412 patent specification clearly lays the foundation for the constructions of the terms at issue.  While there is no need to look outside the patent when the specification defines the terms, the report of Plaintiff Dwayne Glowner's ("Glowner") expert and discovery responses provided by Glowner further support the constructions of the terms proposed herein.  Based on this evidence, there should not be any question as to the constructions of these terms.[1]  However, Glowner has proposed jury instructions that would omit construction of these terms for the jury. Because the Court appropriately construes terms and provides the construction to the jury for its determinations of infringement and invalidity, the jury instructions should include the Court's constructions.  Thus, Muller requests that the Court construe these terms prior to trial and to instruct the jury accordingly.

---

[1] Prior to filing this motion, Muller inquired of Glowner whether there was any dispute as to the constructions proposed by Muller and Glowner's counsel was unable to identify any.  The Court previously construed one limitation — "overlapping stream" — in conjunction with summary judgment proceedings, and that limitation is not the subject of the instant motion. Consequently, there may be no dispute between the parties on the remaining terms to be construed.

## II. LEGAL STANDARD

### A. Claim Construction

"A determination of infringement is a two-step inquiry: first, the claims are construed, and second, the properly construed claims are applied to the accused devices." *Elbex Video, Ltd. v. Sensormatic Elec. Corp*., 508 F.3d 1366, 1370 (Fed. Cir. 2007).

Claim construction is a matter of law for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390-91 (1996). The proper meaning of claim terms is based first on the intrinsic evidence of record, including the literal language of the patent claim, the patent specification, and its prosecution history. *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

"There is a 'heavy presumption' that the terms used in claims mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *SuperGuide Corp. v. DirecTV Enterprises, Inc*., 358 F.3d 870, 874 (Fed. Cir. 2004) (quotations omitted). While it is the claims of a patent, rather than the specification, that measure the patent's right to exclude others, *Novo Nordisk, Inc., v. Genentech, Inc*., 77 F.3d 1364, 1369 (Fed. Cir. 1996), the specification "is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp*., 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*). In addition, the prosecution history informs the meaning of claim language by demonstrating how the inventor and the Patent Office understood the invention at the relevant time. *Id*. at 1317.

Finally, the Court may also consider extrinsic evidence. *See id.* at 1317. Sources of extrinsic evidence include prior art, dictionaries, treatises, and expert or inventor testimony. *Id*.

### B. Means-Plus-Function Claims

To construe a means-plus-function limitation, the Court must follow a two-step approach. First, the court must identify the claimed function. *Asyst Techs., Inc. v. Empak, Inc*., 268 F.3d

1364, 1369 (Fed. Cir. 2001).  "Once the functions performed by the claimed means are identified, the court must then ascertain the corresponding structures in the written structures in the written description that perform those function." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003).  A patent that does not comply with the statutory requirement of clearly associating structure to the recited function is invalid for failure to satisfy the definiteness requirement of Section 112, ¶ 2.  *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1114-16 (Fed. Cir. 2002).

### III.  ANALYSIS

#### A.  "Conveying Means"

Claim 1 of the '412 patent includes the limitation: "conveying means for conveying the overlapping stream through the feeding assembly."  (D.I. 35-3, Ex. 1 to Muller's Motion for Summary Judgment, '412 Patent, claim 1.)  The parties agree that "conveying means" is a means-plus-function term.  (**Exhibit A**, Glowner's February 23, 2010 Objections and Responses to Defendant's Interrogatory No. 1 ("Glowner's Response to Rog. 1"), at 6-7.)  Under 35 U.S.C. § 112, ¶ 6, this term is limited to the corresponding structure described in the specification and its equivalents. *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998).

There is no real dispute about this term, beyond Glowner's proposed jury instructions that altogether omit reference to the required structure.  In his February 23, 2010 Objections and Responses to Defendant's Interrogatory No. 1, Glowner disclosed that the structure performing "the 'conveying means' for conveying the overlapping stream through the feeding assembly is described in the specification beginning at Column 6, Line 29, continuing to Column 7, Line 5."  (Exhibit A, Glowner's Response to Rog. 1, at 7.)  That structure is described as:

Referring to FIGS. 24-26, the conveying assembly includes a conveyor belt assembly having a lower drive roller assembly 86, a pinch roller assembly, a conveyor belt tensioning assembly, upper and lower conveyor belts 92, 2 inch diameter lap roller bearings 94 located on the lap roller shaft 72 (see FIGS. 24 and 26), and $1^7/_8$ inch diameter upper and lower speed up roller bearings. The lower drive assembly 86 includes a lower drive roller shaft 98 and lower drive rollers 100 (see FIG. 19). The lower drive rollers 100 have a diameter of 4 inches. The pinch roller assembly is located to the right of the lap roller assembly 68 below the upper drive roller assembly 70, and includes an upper pinch roller assembly 102 and a lower pinch roller assembly 104. The upper pinch roller assembly 102 (see FIG. 22) is spring loaded and includes an upper pinch roller shaft 106, upper pinch roller levers 108, upper pinch roller tensioning springs, and upper pinch rollers 112. The upper pinch rollers 112 have an inner diameter of $^3/_8$ inch and a $1^3/_8$ outer diameter. The lower pinch roller assembly 104 (see FIG. 18) includes a lower pinch roller shaft 114 and lower pinch rollers 116. The lower pinch roller shaft 114 has a diameter of $^5/_8$ inch and the lower pinch rollers 112 have a diameter of $1^3/_8$ inches.

The present invention includes three upper conveyor belts 92 and three lower conveyor belts 92 that are inline with one another. One of each of these belts 92 is shown in FIG. 26. The center conveyor belts 92 are located between the two inner lap rollers 74 and the two outside conveyor belts 92 are located between the two outer lap rollers 74 and the two inner lap rollers 74. The belts have a width of 1 inch and are approximately 3½ inches apart from one another.

Referring to FIGS. 15 and 21, the conveyor belt tensioning assembly is used to hold tension on the conveyor belts 92 when running inserts having different thicknesses and includes an upper conveyor belt tensioning assembly 118 and a lower conveyor belt tensioning assembly 120. The upper conveyor belt tensioning assembly 118 includes an upper conveyor belt tensioning shaft 122. upper conveyor belt tensioning levers 124, upper conveyor belt tensioning springs 126, and upper conveyor belt tensioning rollers 128.  The lower conveyor belt tensioning assembly 120 includes a lower conveyor belt tensioning shaft 130, lower conveyor belt tensioning levers 132, lower conveyor belt tensioning springs 134, and lower conveyor belt tensioning rollers 136.

(D.I. 35-3, '412 Patent, col. 6, l. 29-col. 7, l. 5.) To avoid reading this lengthy description of the structure to the jury, Muller believes the structure can be summarized. Indeed, in his Infringement Report, Glowner's expert Dr. Howard summarized the relevant structure when he stated that the specific embodiment in the '412 patent "contains a series of conveying belts to convey the inserts through the feeder from the converting assembly to the separating and ejecting assembly. These are shown in the Figures and in Column 6 Line 29 through Column 7 Line 5." (D.I. 43-9, Ex. H-2 to Glowner's Response to Muller's Motion for Summary Judgment, Infringement Expert Report of William S. Howard ("Howard Expert Rpt."), at 37.) Muller agrees with these statements by Glowner. Because this is a means-plus-function term, the means is the structure identified in the specification and its equivalents.

The Court should construe the structure of this means-plus-function limitation as "a series of belts that hold and convey the overlapping stream of inserts through the feeder from the converting means to the separating and ejecting means."

### B. "Conveying Assembly"

Claims 7 and 19 include the term "conveying assembly." The specification of the '412 patent describes the conveying assembly as follows:

> Referring to FIGS. 24-26, the conveying assembly includes a conveyor belt assembly having a lower drive roller assembly 86, a pinch roller assembly, a conveyor belt tensioning assembly, upper and lower conveyor belts 92, 2 inch diameter lap roller bearings 94 located on the lap roller shaft 72 (see FIGS. 24 and 26), and $1^{7}/_{8}$ inch diameter upper and lower speed up roller bearings.
> ...
> Referring to FIGS. 15 and 21, the conveyor belt tensioning assembly is used to hold tension on the conveyor belts 92 when running inserts having different thicknesses and includes an upper conveyor belt tensioning assembly 118 and a lower conveyor belt tensioning assembly 120.

(D.I. 35-3, '412 patent, col. 6, ll. 29-54.)

In his analysis, Dr. Howard stated that the infringement analysis with respect to this limitation was the same for claim 1 as it was for claims 9 and 17, except that "Conveying Means" should be substituted for "Conveying Assembly." (D.I. 43-8, Ex. H to Glowner's Response to Muller's Motion for Summary Judgment, Howard Expert Rpt., at 27.) Thus, under Glowner's own analysis, these two terms are construed the same. Dr. Howard acknowledged that the "conveying assembly moves the overlapping stream of inserts through the feeding assembly" and that the "specific embodiment in the '412 patent contains a series of conveying belts to convey the inserts through the feeder from the converting assembly to the separating and ejecting assembly. These are shown in the Figures and in Column 6 Line 29 through Column 7 Line 5." (D.I. 43-8, Howard Expert Rpt., at 16.)

Thus the Court should construe "conveying assembly" as "a series of belts that hold and convey the overlapping stream of inserts through the feeder from the converting assembly to the separating and ejecting assembly."

## IV. CONCLUSION

For at least the reasons set forth above, Defendant requests that this Court construe these terms as set forth above.

Dated: July 18, 2012                Respectfully submitted,

                                           _s/ *Stephen M. Hankins*_
Stephen M. Hankins
California Bar No. 154886
Alison Maddeford
California Bar No. 248523
SCHIFF HARDIN LLP
One Market, Spear Street Tower
32nd Floor
San Francisco, CA 94105
Telephone: 415-901-8700
Facsimile: 415-901-8701
Email: shankins@schiffhardin.com
        amaddeford@schiffhardin.com

Thomas P. Battistoni
New York Bar No. 2019883
Henry Behnen
New York Bar No. 4890125
SCHIFF HARDIN LLP
666 Fifth Avenue
17th Floor
New York, NY 10103
Telephone: 212.753.5000
Facsimile: 212.753.5044
Email: tbattistoni@schiffhardin.com
        hbehnen@schiffhardin.com

Stefan V. Stein
Florida Bar No. 300527
GRAY ROBINSON, P.A.
201 N. Franklin Street
Suite 2200
Tampa, Florida 33602
Telephone: 813-273-5000
Facsimile: 813-273-5145
Email: stefan.stein@gray-robinson.com

*Attorneys for Defendant Muller-Martini Mailroom Systems, Inc.*

- 9 -

## **CERTIFICATE OF SERVICE**

     I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by filing the above with the Court's CM/ECF electronic filing system this 18th day of July, 2012.

                               _s/ *Stephen M. Hankins*_____
                                Stephen M. Hankins